UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MONIQUE BLUFORD,

Plaintiff,

v.

GENERAL DYNAMICS LAND SYSTEMS, INC., a Delaware corporation,

Defendant.

Case No.
Hon.
Mag. Judge

______________________________/

James C. Baker (P62668)
Attorney for Plaintiff
STERLING ATTORNEYS AT LAW, P.C.
33 Bloomfield Hills Pkwy., Ste. 250
Bloomfield Hills, MI 48304
(248) 644-1500
jbaker@sterlingattorneys.com

______________________________/

**COMPLAINT AND JURY DEMAND**

Plaintiff Monique Bluford by her attorney James C. Baker of Sterling Attorneys at Law, P.C., for her Complaint and Jury Demand against Defendants General Dynamic Land Systems, Inc., states as follows:

**Jurisdiction**

1. Plaintiff is a female who resides in Oakland County Michigan and is a former employee of Defendant.

2. Defendant General Dynamics Land Systems, Inc. ("GDLS") is a Delaware corporation, with its primary Michigan place of business being in Sterling Heights in Macomb County.

3. Defendant GDLS conducts substantial business in this judicial District.

4. Plaintiff worked for GDLS in this judicial district.

5. This Court has subject matter jurisdiction of Plaintiff's claims pursuant to 28 USC 1331 (federal question), 28 USC 1332 (diversity and amount in controversy), 28 USC 1343 (civil rights), and 28 USC 1367 (supplemental jurisdiction).

6. Venue is proper in this district pursuant to 28 USC 1391(b)(2), in that a substantial part of the events giving rise to this claim occurred in this judicial district, and 42 USC 2000e-5(f)(3), in that the relevant employment records are maintained and administered in this district.

**Facts underlying Plaintiff's claims**

7. Plaintiff was employed with GLDS for about a year, having been hired as an Engineering Project Lead on October 16, 2023.

8. Plaintiff's base salary was $130,00 when hired, and it was $132,600 when she left her employment.

9. The increase in salary was related to her performance.

10. Plaintiff suffers from underlying severe allergies, including allergies to certain chemicals, fragrances, and perfumes that cause difficulty breathing and asthmatic reactions.

11. Monique Bluford worked a hybrid schedule (remotely and in person), which was touted by GDLS to maximize work/life balance.

12. Plaintiff performed her duties successfully.

**The onset of allergies and the onset of difficulties.**

13. On January 11, 2024, new senior manager N.G. sent an email requesting 1:1 meetings with Plaintiff's team, to get to know her people.

14. The meeting between Plaintiff and N.G. was scheduled for January 17, 2024.

15. Oddly, on January 16, 2024, while she worked from home – which was known to management – Plaintiff was contacted by N.G. informing her she had looked for Plaintiff and accused her of not being at her desk.

16. When first meeting N.G., Plaintiff experienced a strong fragrance in her office.

17. Because of her experience, and given her allergies, asthma, and asthmatic sensitivities, Plaintiff requested to meet in a fragrance-free location.

18. She explained to N.G. about her sensitivity to fragrances and N.G. mentioned that people had commented to her in the past about the potency of her perfume.

19. N.G. said that she would schedule a room; further, N.G. did not wear perfume the day of the 1:1 meeting.

20. On January 17, 2024, the two met; Plaintiff thought it went well with nothing unusual happening.

21. On January 29, 2024, N.G. physically attended Plaintiff's staff meeting for the first time; N.G. wore perfume that day.

22. N.G. sat next to Plaintiff and the perfume triggered an asthma attack in Plaintiff causing her to leave the meeting.

23. Plaintiff took some medicine and then listened online for the remainder of the meeting.

24. The effects of the attack lingered, such that Plaintiff informed Defendant that she planned to work from home the rest of the week; no comment or objection was made.

25. On January 30, 2024, Plaintiff was informed that the company's work-from-home policy was going to be curtailed.

26. Plaintiff was ordered to work in-person Wednesday through Friday that week; she was the only person told to do that, as her co-workers remained "work-from-home."

27. Plaintiff made it a point to say she would have to call in to staff meetings if N.G. was going to attend regularly, because her perfume triggered her asthma.

28. No objection from management was stated; in fact, Plaintiff was told not to worry as future interactions with N.G. would be minimal.

29. On February 1, 2024, Plaintiff learned that N.G. had said something concerning about the 1:1 meeting, but she had no idea what it was.

**Work from home is curtailed again.**

30. On February 2, 2024, a department-wide memo was circulated requiring in-person work a minimum of four days per week.

31. Thereafter, N.G. scheduled a last-minute meeting with Plaintiff and a co-worker to discuss "obsolescence transition."

32. Both Plaintiff and her co-worker were scheduled to work from home the day of the impromptu meeting.

33. Plaintiff asked to call in, and her request was denied.

34. N.G. rescheduled the meeting for when both Plaintiff and her co-worker were scheduled to work in the office.

35. N.G. arrived late for the meeting and Plaintiff immediately had trouble breathing, a reaction to N.G.'s perfume.

36. Plaintiff had to leave the room, but N.G. followed her.

37. Plaintiff explained she couldn't breathe because of the perfume, to which N.G. angrily responded that they had to have the meeting that day.

38. Plaintiff went to the kitchenette area and N.G. tried to get her to sit at the same table.

39. Plaintiff refused citing the asthmatic reaction and tried to stand as far away as possible while still listening to what N.G. was saying.

40. The meeting digressed into an angry interrogation over Plaintiff's projects; this was not on any agenda, and Plaintiff had not been prepared to address her projects.

41. N.G. became angrier still and reported Plaintiff to Human Resources for supposedly not meeting expectations.

**The first meeting with Human Resources.**

42. On March 14, 2024, Plaintiff met with N.G. and Human Resources.

43. The meeting had to be held outside due to N.G. wearing perfume again.

44. N.G. had been aware in advance that the meeting with HR was scheduled for March 14.

45. Even meeting outside, Plaintiff was not able to sit next to N.G. because of her perfume.

46. In that meeting N.G. informed HR she was offended that Plaintiff complained her perfume triggered an asthmatic reaction.

47. On March 15, 2024, Plaintiff requested reasonable accommodations due to the asthmatic reaction, and informed GDLS how N.G.'s perfume harmed her by triggering an asthma attack.

48. GDLS said it would investigate, which never happened.

**Plaintiff begins to be treated differently.**

49. After meeting with HR and requesting accommodations, a meeting was held with Plaintiff's group and one of the team members was sick.

50. N.G. outwardly displayed sympathy and understanding toward that person and allowed them to call in for the meeting.

51. N.G. had compelled Plaintiff to attend a previous meeting in person despite knowing how her perfume triggered a reaction.

52. Previously, all meetings would have call ins, as well as virtual meeting rooms.

53. N.G. reported she was ceasing the practice of calling in to meetings, at least with regard to Plaintiff.

54. Plaintiff was told calling in to meetings was not an option.

55. However, if someone else needed a call in, a call in would be added to the meeting.

56. By this time the in-person work schedule became four days in the office.

57. On March 19, 2024, Plaintiff discovered that N.G. had approved a male coworker to still work remotely, including a two-week remote/two week in-person schedule.

58. This conflicted with GDLS' memo on returning to in-person work four days per week.

**Performance issues by everyone were highlighted against Plaintiff.**

59. A review meeting with designers and project leads was held.

60. Deficiencies throughout the team are noted; nobody was progressing faster than Plaintiff.

61. On May 8, 2024, Plaintiff was called to a meeting and was informed two newly assigned projects were incomplete; no other feedback was given.

62. Thereafter on May 13, 2024, a quarterly review was scheduled; this was to have been performed earlier by the manager who hired Plaintiff, but he had left GDLS.

63. Plaintiff was informed that N.G. was reporting Plaintiff to HR as having "performance issues."

64. Plaintiff's performance was supposedly being documented; however, she never received anything formal from HR.

65. Plaintiff became aware and understood this was the start of N.G. pushing false narratives about her to a new manager and GDLS.

66. N.G. making false claims was known by GDLS and Plaintiff's previous manager, yet nothing was done to correct N.G.'s behavior.

**Plaintiff's performance is evaluated "sub-par."**

67. On July 22, 2024, Plaintiff received a quarterly check-in where she was rated "sub-par."

68. This was despite telling her manager that work was incomplete, and the manager telling her it was not an issue.

69. Plaintiff learned the "sub-par" evaluation was motivated by N.G. who was still upset that Plaintiff reported an allergic reaction to her perfume.

70. Thereafter, between July 29 and September 23, 2024, scrutiny over Plaintiff's work increased, as did reports of detrimental performance.

71. On September 23, 2024, Plaintiff received an "all negative" quarterly review.

72. A new co-worker who was hired two weeks after Plaintiff, and whose work was consistent with Plaintiff, received a lenient quarterly review.

73. Plaintiff contacted HR to report she felt she was being retaliated against.

**Evidence supported retaliation.**

74. On October 8, 2024, Plaintiff and her coworkers, who all worked remotely at least one day per week, discussed if they felt they were constantly being questioned and their work was scrutinized.

75. Plaintiff was the only one subjected to this heightened scrutiny.

76. Plaintiff was the only one who reported N.G. for triggering an allergic reaction due to a perfume allergy.

77. Plaintiff was the only one who reported she felt she was being retaliated against.

**The retaliation and hostile work environment is severe and pervasive.**

78. Plaintiff felt such severe harassment, and the instances of an allergic reaction pervaded every interaction with N.G., that she requested medical leave.

79. Medical leave was supported by Plaintiff's treating physicians.

79. While on leave her asthma improved, which was a direct indication that the work environment with N.G. was causing her medical issues.

80. Plaintiff experienced an environment she worked in that was so hostile, simply because she reported a verifiable health condition, and identified the source of the aggravation to be N.G.

81. N.G. took offense to Plaintiff's reporting and instead of simply refraining from wearing the offensive and harmful perfume, she retaliated.

82. GDLS, armed with knowledge of the verifiable health condition, caused by an allergic reaction to N.G.'s perfume, did nothing to abate N.G.'s behavior in wearing the perfume and in retaliating.

83. Plaintiff reasonably and medically felt that she could not return to work for fear of further medical detriments and retaliation.

84. Plaintiff had asked to work remotely to accommodate her disability; her treaters supported her requested accommodations.

85. Rather than accommodate her disability, performance deficiencies were manufactured.

86. Defendant and N.G. made it difficult for Plaintiff to formally request accommodations; for example, when she asked for an accommodated work schedule Plaintiff was told to use the nursing mothers' room (which didn't alleviate N.G. intentionally coming into near-physical contact with Plaintiff while wearing perfume), as well as Defendant creating artificial barriers to her request for accommodations (e.g. telling Plaintiff it would not accept her doctor's electronic signature, or unreasonably denying the request for some other technicality).

87. Plaintiff's co-workers without disabilities were not treated the same; they weren't scrutinized.

88. The co-workers were allowed to work remote schedules, they were allowed to call in when sick, they didn't report being over-scrutinized, and they didn't suffer negative quarterly reviews.

89. N.G. created the narrative that Plaintiff suffered performance deficiencies, which General Dynamics Land Systems believed.

90. That Plaintiff suffered performance deficiencies was simply untrue; she and her co-workers were similarly performing, yet Plaintiff was the one given poor reviews and reported to HR.

91. GDLS was aware of Plaintiff's asthma and the disabilities arising from the working environment created by N.G., an environment allowed to be maintained to the detriment of an employee's health.

92. GDLS failed to accommodate her request to be free from harmful aromatics, and further failed to accommodate her request to work remotely.

93. Working remotely provided an opportunity for Plaintiff to continue working in a safe environment.

**How Plaintiff's employment ended.**

94. The circumstances of Plaintiff's employment with GDLS were devastating.

95. The physical and mental harm she suffered were long term.

96. Her experiences were dire and potentially life threatening.

97. Plaintiff legitimately feared continued retaliation.

98. Plaintiff was left with no choice but to end her employment.

99. To stay would be to continue to suffer detriments to her physical and mental health.

100. Plaintiff communicated her experiences to GDLS only to be practically told: "don't let the door hit you on the way out."

101. GDLS created, maintained, and/or knowingly permitted working conditions so intolerable to Plaintiff that a reasonable person would feel compelled to resign.

102. Plaintiff's adverse employment action rises to the level of a constructive discharge.

103. Defendant's actions during her employment and since have resulted in serious financial and emotional hardship to Plaintiff.

104. Defendant, by its agent and employee, engaged in unfair, unhealthy, discriminatory, and retaliatory treatment against Plaintiff, created and maintained a severe or pervasive hostile work environment, all culminating in Plaintiff's constructive discharge, adversely impacting her employment and employment opportunities.

**COUNT I**
**DISABILITY DISCRIMINATION IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT (ADA), 42 USC 12101**

105. Plaintiff incorporates the preceding paragraphs by reference.

106. Plaintiff timely files this Complaint within 90 days of receiving her EEOC right to sue notice; the right to sue was issued on May 27, 2026.

107. Plaintiff has a disability as defined in the Americans with Disabilities Act, 42 USC 12102(2).

108. Defendant discriminated against Plaintiff with respect to her terms, conditions, and privileges of employment due to their predisposition or intent to discriminate based on Plaintiff's disability, perceived disability, and/or medical history.

109. Defendant treated employees who did not have disabilities, who were not regarded as disabled, and/or who did not have medical histories, more favorably than Plaintiff.

110. Defendant's discrimination denied Plaintiff the opportunity for continued employment and adversely affected her compensation, terms, conditions, and privileges of employment in violation of the Americans with Disabilities Act, 42 USC 12101, *et seq*.

111. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and will continue to suffer severe injuries, including the following:

A. loss of employment, compensation, fringe and other benefits;

B. loss of earning potential;

C. loss of reputation;

D. embarrassment, humiliation, betrayal, shame, inconvenience, loss of self-esteem, and mental anguish; and

E. other incidental and consequential damages, including attorney fees.

## COUNT II
## DISABILITY DISCRIMINATION IN VIOLATION OF THE MICHIGAN PERSONS WITH DISABILITIES CIVIL RIGHTS ACT, MCL 37.1101

112. Plaintiff incorporates the preceding paragraphs by reference.

113. Plaintiff has a disability as defined in the PWDCRA, MCL 37.1103(d)(i)(A).

114. Defendant discriminated against Plaintiff with respect to her terms, conditions, and privileges of employment due to their predisposition or intent to discriminate based on Plaintiff's disability, perceived disability, and/or medical history.

115. Defendant treated employees who did not have disabilities, who were not regarded as disabled, and/or who did not have medical histories, more favorably than Plaintiff.

116. Defendant's discrimination denied Plaintiff the opportunity for continued employment and adversely affected her compensation, terms, conditions, and privileges of employment, in violation of the Michigan Persons

With Disabilities Civil Rights Act, MCL 37.1101, *et seq*, and in particular, MCL 37.1103(d)(ii) and (iii).

117. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and will continue to suffer severe injuries, including the following:

A. loss of employment, compensation, fringe and other benefits;

B. loss of earning potential;

C. loss of reputation;

D. embarrassment, humiliation, betrayal, shame, inconvenience, loss of self-esteem, and mental anguish; and

E. other incidental and consequential damages, including attorney fees.

**COUNT III**
**RETALIATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 USC 2000e-3(a)**

118. Plaintiff incorporates the preceding paragraphs by reference.

119. Defendant retaliated against Plaintiff for reporting discrimination and retaliation, as well as reporting the health concerns she suffered, the cause of same, and requesting relief and accommodations from the harms she suffered.

120. The reporting was known to Defendant.

121. Plaintiff suffered isolation, disparate treatment, and adverse employment actions via employment reviews as a result of her reporting.

122. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and will continue to suffer severe injuries, including the following:

A. loss of employment, compensation, fringe and other benefits;

B. loss of earning potential;

C. loss of reputation;

D. embarrassment, humiliation, betrayal, shame, inconvenience, loss of self-esteem, and mental anguish; and

E. other incidental and consequential damages, including attorney fees.

**COUNT IV**
**RETALIATION IN VIOLATION OF THE MICHIGAN ELLIOTT-LARSEN CIVIL RIGHTS ACT, MCL 37.2701(a)**

123. Plaintiff incorporates the preceding paragraphs by reference.

124. Defendant retaliated against Plaintiff for reporting discrimination and retaliation, as well as reporting the health concerns she suffered, the cause of same, and requesting relief and accommodations from the harms she suffered.

125. The reporting was known to Defendant.

126. Plaintiff suffered isolation, disparate treatment, and adverse employment actions via employment reviews as a result of her reporting.

127. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and will continue to suffer severe injuries, including the following:

A. loss of employment, compensation, fringe and other benefits;

B. loss of earning potential;

C. loss of reputation;

D. embarrassment, humiliation, betrayal, shame, inconvenience, loss of self-esteem, and mental anguish; and

E. other incidental and consequential damages, including attorney fees.

**RELIEF REQUESTED**

WHEREFORE, Plaintiff Monique Bluford respectfully requests that this Honorable Court:

A. Enter judgment against Defendant;

B. Award all rights and benefits of employment as if Plaintiff had not been discriminated against including, without limitation, front pay (because reinstatement is unreasonable and unsafe), back pay, fringe benefits, interest as an element of damages,

and consequential and compensatory damages in an amount to be determined at trial;

C. Award punitive and exemplary damages in an amount to be determined at trial;

D. Award attorney fees and reasonable costs in bringing this action; and

E. Award such other relief as this court deems just and proper.

**JURY DEMAND**

Plaintiff Monique Bluford by her attorney James C. Baker of Sterling Attorneys at Law, P.C. respectfully requests a trial by jury.

Respectfully submitted,

STERLING ATTORNEYS AT LAW, P.C.

By: /s/ James C. Baker
James C. Baker (P62668)
Attorney for Plaintiff
33 Bloomfield Hills Pkwy., Ste. 250
Bloomfield Hills, MI 48304
(248) 644-1500
jbaker@sterlingattorneys.com

Dated: August 24, 2026